LONA ROSIER, *Adm'rx, etc.*

*v.*

GARRON, INC., *et al.*

(No. CC 885)

Submitted May 15, 1973.          Decided July 17, 1973.

Concurring Opinion September 14, 1973.

*Loudoun L. Thompson,* for plaintiff.

*Bean & Hamilton, Ralph J. Bean, John M. Hamilton,* for defendants.

NEELY, JUSTICE:

This case from the Circuit Court of Grant County, West Virginia, presents three questions of law certified to this Court by the circuit court upon its own motion.

Plaintiff's cause of action arose on October 18, 1966, when plaintiff's decedents died as a result of a collision which occurred on a public highway in Grant County, West Virginia, between a motor vehicle driven and occupied by the deceased and a vehicle driven and owned by the defendants. Plaintiff, Lona Rosier, qualified as administratrix of the decedents' estates before the Registrar of Wills for Baltimore City, Maryland, and letters of administration were issued to her on October 1, 1968. Thereafter, on October 11, 1968, Lona Rosier instituted this wrongful death action in West Virginia as the personal representative of the decedents. Defendants, Garron, Inc., and Lloyd Oliver Godby, moved to dismiss the civil actions against them on several grounds, the most important of which was that the plaintiff lacked the capacity to maintain the action in West Virginia as a non-resident personal representative.

A ruling on these motions was delayed until October 23, 1972, for reasons which are not material to the questions raised in this case, at which time the circuit court consolidated the civil actions into one action, and denied the defendants' motion to dismiss on all grounds other than the ground of plaintiff's lack of capacity to

sue. However, on that ground alone, the circuit court dismissed the action. The circuit court further ruled that Chapter 55, Article 2, Section 18 of the *Code of West Virginia,* 1931, which tolls the statute of limitations after an action has been dismissed, is not applicable to actions for wrongful death. Additionally, the court denied plaintiff's motion to amend under Rule 15 of the *West Virginia Rules of Civil Procedure* by substituting a person with proper capacity to sue. As a result of these rulings further proceedings on plaintiff's cause of action were foreclosed by the two year limitation for bringing actions for wrongful death under Chapter 55, Article 7, Section 5 of the *Code of West Virginia,* 1931, as amended. The circuit court then certified to this Court the following questions:

1. "Did the Circuit Court of Grant County, West Virginia, err in holding that a foreign administratrix of an estate duly qualified and appointed by the State of Maryland does not have proper capacity to maintain a wrongful death action instituted in the Circuit Court of Grant County, West Virginia, on October 11, 1968, for wrongful death which occurred in Grant County, West Virginia, on the 18th day of October 1966?"

2. "Did the Circuit Court of Grant County, West Virginia, err in holding that the provisions of Chapter 55, Article 2, Section 18 of the *West Virginia Code* do not apply to an action of wrongful death brought under Chapter 55, Article 7, Section 5 and Section 6 of the *West Virginia Code?*"

3. "Did the Circuit Court of Grant County, West Virginia, upon plaintiff's motion to amend her bill of complaint, err in not granting leave to plaintiff to substitute or add a person duly qualified and appointed by the County Court of Grant County, West Virginia, as ancillary administrator of a non-resident estate?"

The issues of the first certified question involve the effect of the language of the wrongful death statute, *Code* 55-7-6, which provides that the action shall be brought in

the name of the personal representative, read with the construction placed upon it by *Rybolt v. Jarrett,* 112 F.2d 642 (4th Cir. 1940) and the effect of a 1967 amendment to *Code* 55-7-6.

In 1966, the year in which the cause of action arose, *Code* 55-7-6 provided that "Every such [wrongful death] action shall be brought by and in the name of the personal representative of such deceased person . . . ." The 1940 federal court decision in *Rybolt v. Jarrett, supra,* held that a non-resident administrator could not institute a wrongful death action in West Virginia because Chapter 44, Article 5, Section 3 of the *Code of West Virginia* stated in relevant part:

> "*Notwithstanding any other provision of law,* no person not a resident of this state . . . shall be appointed *or act* as executor, administrator, curator, guardian or committee . . . ." [Emphasis supplied.]

Although the *Rybolt* opinion recited the law of other jurisdictions, which permitted non-resident administrators to sue under the wrongful death statutes of other states, the court, nonetheless, held that the West Virginia Legislature intended to prohibit non-resident personal representatives from suing in West Virginia. The *Rybolt* decision was thereafter accepted by the bar of West Virginia as the law of this State until the West Virginia Legislature amended *Code* 55-7-6 in 1967 to permit non-resident personal representatives to sue under the wrongful death statute. Prior to 1967, we believe that *Rybolt* stated the correct rule of law.

Plaintiff argues that even if the law before 1967 precluded an action by a non-resident administrator, the 1967 amendment, passed before the institution of this action in 1968, permits the action to be brought by a non-resident, even though the death occurred before the amendment. We disagree. The amended part of *Code,* 55-7-6 is qualified by the explicit statement: "The provisions of this section shall not apply to actions brought

for the death of any person occurring prior to the effective date hereof."

Where a statute is unambiguous, its plain meaning is to be accepted without resort to the rules of interpretation. *Baird-Gatzmer Corp. v. Henry Clay Coal Min. Co.*, 131 W.Va. 793, 50 S.E.2d 673 (1948); *Dotson v. Gilbert*, 129 W.Va. 130, 39 S.E.2d 108 (1946). A grammatical analysis of the last quoted qualifying provision of *Code*, 55-7-6, which the reader may prefer to diagram, clearly indicates that the amended section does not apply to actions where the death occurred before the effective date of the amendment. Analyzed grammatically, the subject of the qualifying sentence is "provisions"; the predicate verb is "apply"; and, the object of the verb "apply" is the word "actions". The noun "actions" is modified by the participle "brought", and although we may concede that "brought" has the same meaning as the word "begun", it in no way changes the sense of the noun "actions". On the contrary, the primary modification of the noun "actions" comes from the prepositional phrase "for the death" in which the noun "death" is again modified by a further prepositional phrase "of any person" and further modified by the participle "occurring". The prepositional phrase "prior to the effective date hereof" modifies the participle "occurring", remembering that "occurring" itself modifies the noun "death". Therefore, reading the sentence grammatically, we see that the amended provision does not apply to actions for a death which occurred before the effective date of the amendment. It is, quite obviously, the death of the decedent and not the time of the institution of the action, which determines the applicability of the amendment to the statute. We hold, therefore, that the circuit court did not err in holding that a foreign administratrix does not have capacity to sue under the wrongful death statute for a suit brought in 1968 concerning an alleged wrongful death which occurred in 1966.

The second certified question presents the issue of whether the saving provision of Chapter 55, Article 2,

Section 18 of the *Code of West Virginia,* 1931, applies to actions for wrongful death. *Code,* 55-2-18 says in pertinent part:

> "If any action or suit commenced within due time, in the name of or against one or more plaintiffs or defendants, abate as to one of them by the return of no inhabitant, or by his or her death or marriage, or if, in an action or suit commenced within due time, judgment or decree (or other and further proceedings) for the plaintiffs should be arrested or reversed on a ground which does not preclude a new action or suit for the same cause, or if there be occasion to bring a new action or suit by reason of such cause having been dismissed for want of security for costs, or by reason of any other cause which could not be plead in bar of an action or suit, or of the loss or destruction of any of the papers or records in a former action or suit which was in due time; in every such case, notwithstanding the expiration of the time within which a new action or suit must otherwise have been brought, the same may be brought within one year after such abatement, dismissal or other cause, or after such arrest or reversal of judgment or decree, or such loss or destruction, but not after."

This issue is controlled by the case of *Smith v. Eureka Pipe Line Co.,* 122 W.Va. 277, 8 S.E.2d 890 (1940) which held that the saving provision of *Code,* 55-2-18 does not apply to actions for wrongful death. In the *Smith* case the Court reasoned that the two year limitation upon the bringing of an action for wrongful death is an integral part of the statute itself and creates a condition precedent to the bringing of an action which bears no relationship to statutes of limitation, and contains no language that would justify a joint construction with the statutes of limitation. The Court in *Smith* traced the origin of the saving provision to the revised *Code of Virginia* of 1819, which contained a substantially similar provision as that contained in the *Virginia Code* of 1849. The provisions of this section have remained in effect in West Virginia from the State's inception until the present time. As there were no enactments in the United States creating the

right of recovery for death by wrongful act until after the British Parliament passed Lord Campbell's Act in 1846, the Court in *Smith* reasoned that it is obvious that the saving section at the time of its original enactment could not have been intended to include proceedings for death by wrongful act, as in 1819 there was no cause of action for wrongful death. The two year limitation on the bringing of an action for wrongful death is an integral part of the cause of action, and statutes in derogation of common law will be strictly construed. *Newhart v. Pennybacker*, 120 W.Va. 774, 200 S.E. 350 (1938); *Stephenson v. Cavendish*, 134 W.Va. 361, 59 S.E.2d 459 (1950).

Four members of this Court believe it proper under the doctrine of *stare decisis* to reaffirm the holding of *Smith*, since a square confrontation with the logic of that decision is essential to the resolution of this case. This opinion writer would squarely reverse the holding of *Smith*, because, in my opinion, its reasoning is fallacious, and it does not promote any reasonable civil practice policy.

This Court therefore holds that the circuit court did not err in holding that the provisions of Chapter 55, Article 2, Section 18 of the *Code of West Virginia*, 1931, do not apply to an action for wrongful death brought under Chapter 55, Article 7, Section 5 and Section 6 of the *Code of West Virginia*, 1931, as amended.

The last question to be decided by this Court is whether the circuit court abused its discretion by denying plaintiff's motion to amend her complaint by adding a person duly qualified and appointed as ancillary administrator by the County Court of Grant County. There is nothing in the record to indicate that the judge's denial of the motion to amend was a sanction for failure to prosecute the action, or that his ruling was prompted by any action on the part of plaintiff which had prejudiced the defendants.

Initially there is a question with regard to whether the captions in a complaint are an integral part of the pleadings, because if they cannot be considered part of the pleadings, then Rule 15, which governs amendments to pleadings would not apply. Under the West Virginia Rules, the captions serve a similar function to that performed under earlier practice by specific allegations in the declaration. Before the adoption of the new rules, in an action for wrongful death, it was necessary for the plaintiff to allege in the declaration his proper capacity to sue, and a declaration which lacked such an allegation was deficient and demurrable. In the case of *Johnson v. Hawkins*, 110 W.Va. 199, 157 S.E. 412 (1931) the Court specifically held in Syllabus pt. 1, "A declaration by an administrator which fails to allege the appointment and qualifications of the administrator is bad on demurrer." As authority for this proposition, the Court cited *Brogan v. Union Traction Co.*, 76 W.Va. 698, 86 S.E. 753 (1915) as well as *Perry v. Coal Co.*, 74 W.Va. 122, 81 S.E. 844 (1914). Therefore under former practice, the defect presented in this case of lack of capacity could have been changed by an amendment to the body of the pleadings, and a change in caption would have followed automatically. However, by operation of Rule 9 the requirement of pleading capacity is eliminated. Rule 9(a) says:

> "It is not necessary to aver the capacity of a party to sue or be sued or the authority of a party to sue or be sued in a representative capacity or the legal existence of an organized association of persons that is made a party."

When Rule 9(a) is read in conjunction with Rule 10(a), which sets forth the requirements for captions, and provides that in the complaint the title of the action shall include the names of all parties, it is logical to infer that the short statement in the caption asserting that a person is bringing suit as administrator of an estate, next friend, guardian, curator, etc., is an affirmative allegation that the individual suing has the proper capacity to sue. Therefore, as applied to this case, a substitution of a person with legal capacity to sue for the named plaintiff

in the caption represents the same type of amendment which would have been permitted in a proper case under Chapter 56, Article 4, Section 24, of the *Code of West Virginia,* which governed amendments to the body of the pleadings and was applicable before the adoption of the Rules.

There are no West Virginia cases under the Rules which specifically deal with the right to amend for the purposes of substituting a party with proper capacity to sue. However, since West Virginia Rule 15 is an exact duplication of Rule 15 of the Federal Rules of Civil Procedure, the federal courts have satisfactorily resolved the question, and have uniformly held that under proper circumstances, a motion to substitute a party with proper capacity to sue is appropriate under Rule 15. 3 *Moore's Federal Practice,* paragraph 15.08[5]. In the case of *Russell v. New Amsterdam Casualty Co.,* 303 F.2d 674 (8th Cir. 1962) the court ruled that an amendment which substitutes a party having legal capacity to sue for one lacking such capacity should be allowed. The court cited with approval 16 *Am. Jur.,* Death, Sections 290, 291, at p. 202 where the text writer says:

> "By the weight of authority, if the action to recover for the negligent killing of a person is brought in the name of the wrong plaintiff, the proceedings may be amended to the end that the proper party be made plaintiff therein."

A more precise statement of the rule is found in *New York Evening Post Co. v. Chaloner,* 265 F. 204 (2 C.A., 1920) at p. 213 where the court said:

> "[w]here there is no change in the cause of action and the party substituted bears some relation of interest to the original party and to the suit the substitution is allowed."

Citing the *New York Evening Post* case with approval, another federal court in *Mitchell v. Telephone Answering Service, Inc.,* 183 F. Supp. 607 (D. Puerto Rico, 1959), permitted the substitution of a proper trustee in bankruptcy for another person who had been mistakenly

named as trustee in bankruptcy. However, the court pointed out that this case was not merely an instance of misnomer, but that the attorneys for the plaintiff bankrupt intended to name the original individual as party plaintiff. The court, however, permitted amendment to substitute the properly appointed trustee in bankruptcy as the party plaintiff.

In accord with an expansive concept of the right to amend is *United States v. Koike*, 164 F.2d 155 (9 C.A., 1947). In that case an action was instituted in the United States District Court of Hawaii by the Price Administrator as plaintiff for wartime violations of federal statutes. Some time after the date of the alleged violations, price controls over lumber were lifted, and the previous Price Administrator ceased to exist as an officer. In 1946 the President, exercising the authority conferred upon him by the First War Powers Act, issued an executive order which transferred the functions of the Price Administrator to the administrator of the newly created Office of Temporary Controls. The Temporary Controls Administrator moved the district court to substitute him as plaintiff under Rule 25 (d) of the Federal Rules of Civil Procedure; however, the district judge ruled that the Temporary Controls Administrator was not a successor in office to the Price Administrator as required by Rule 25 (d). Thereafter, while an appeal was pending, the Office of Temporary Controls was terminated by virtue of an executive order, and the functions of the Temporary Controls Administrator were distributed among other departments and agencies. The United States Attorney then moved in the United States Circuit Court for a summary reversal of the district court and for substitution of the United States as a party plaintiff. Under Rule 15 of the Federal Rules the circuit court permitted substitution of the United States as a party plaintiff and stated the proper rule as follows:

> "Under these circumstances, we believe that the motion for substitution should be granted. The federal courts have broad powers to amend pleadings in matters of form at any stage of the

case. 28 U.S.C.A. § 777; Rule 15, Federal Rules of Civil Procedure. This power is liberally construed to the end that the courts may be free of technical rules of procedure which delay the determination of causes on their merits. It is within the scope of this power to permit the substitution of a party for whose benefit an action was brought in place of the nominal plaintiff. This has been done both where the nominal plaintiff was found to lack authority to sue, and where the statute of limitations would have barred the commencement of a new action by the real plaintiff. McDonald v. Nebraska, 8 Cir., 101 F. 171. A fortiori it may be done here, where the nominal plaintiff originally had authority to sue, but was later deprived of it."

In general courts have held that there cannot be an amendment which will completely change the cause of action, although there is no consensus with regard to what constitutes a change in a cause of action. For example, in *Crook v. Ferguson,* 123 W.Va. 490, 16 S.E.2d 620 (1941), this Court ruled that where an agent for a disclosed principal, having no interest in or title to the subject matter in controversy, brought an action in his own name as agent for his principal, the action was a nullity and the defect in jurisdiction could not be cured by joining the principal as co-plaintiff or by substituting the principal as sole plaintiff. However, the *Crook* case did not hold that an amendment to substitute a party plaintiff with capacity to sue was improper, it merely said that under the facts of that case such an amendment would have changed the cause of action and therefore was improper. Historically, before the Rules, this Court has considered the propriety of amendments with regard to the criterion of whether the cause of action would be changed. See also *McMechen v. Baltimore & Ohio R. Co.,* 90 W.Va. 21, 110 S.E. 474 (1922); *Brown v. Cook,* 77 W.Va. 356, 87 S.E. 454 (1915); *Kuhn v. Brownfield,* 34 W.Va. 252, 12 S.E. 519 (1890); *Bartley v. Western Maryland R. Co.,* 81 W.Va. 795, 95 S.E. 443 (1918).

Under the new rules this Court has taken a liberal view of the right to amend. It has adopted a functional

view of the appropriateness of amendments, as distinguished from the earlier rigid and more formalistic distinction of whether the amendment changes in any way the cause of action. *See* Lugar & Silverstein, *West Virginia Rules of Civil Procedure,* p. 135 (1960).

In the recent case of *Nellas v. Loucas,* 156 W.Va. 77, 191 S.E.2d 160 (1972) this Court, speaking through Mr. Justice Haden, discussed the right to amend with reference to the presentation of affirmative defenses, and established three criteria: (1) the amendment should permit the presentation of the merits of the action; (2) the adverse party should not be prejudiced by the sudden assertion of the [subject of the amendment]; and, (3) the adverse party should be given ample opportunity to meet the issue. Although the *Nellas* case dealt with the appropriateness of amending an answer to allege the affirmative defense of statute of limitations, the Court would now extend the functional criteria established in that case to govern judicial discretion with respect to all motions to amend.

Rule 15 provides that leave to amend shall be "freely given [by the Court] when justice so requires." A definition of the word "justice" has consumed the efforts of the finest minds in the fields of philosophy and theology as well as law. A general definition would be impossible, yet it is necessary to give the word "justice" as used in Rule 15 (a) and "just" as used in Rule 1 some functional definition.

Long before the days in which Glanvil penned Writs for Henry II there has been conflict between the letter of the law and the spirit of the law. (See, for example, a popular Elizabethan lampoon on the subject in the confrontation between Shylock and Antonio in Shakespeare's *Merchant of Venice,* Act IV, Scene I.)

The urge to establish a society which is governed by the rule of law rather than the rule of men oftentimes leads courts themselves to prefer to follow an absurd rule which conflicts with their general concepts of equity,

which Roscoe Pound describes as "the infusion of morality and morals into the legal system," *Jurisprudence,* Vol. III, p. 506, rather than to undertake to assure a reasonable result. There is the fear on the part of judges that the expansive use of discretion governed by functional rules will lend itself to the appearance of arbitrary and capricious policy making by those entrusted with the administration rather than the formulation of the law.

The urge to formalism in the law comes then from a feeling that forms are our safeguard against arbitrary action on the part of judges, and from the well considered observation so succinctly formulated by Adam Smith in the *Wealth of Nations,* that mankind can stand a great deal of injustice but only a small amount of uncertainty. The common law of the fourteenth and fifteenth centuries developed into a system in which a specific set of facts yielded a particular legal consequence. It was not a system with general ideas about law, but rather, in the words of Pollock and Maitland, "a game of forfeits." *History of English Law,* Vol. II, p. 519.

As society became more sophisticated, it sought to embody its moral, ethical, and religious standards of right and wrong in the law. Formalism, which served early law well, became an encumbrance and was undermined by the creation of legal fictions and linguistic distinctions which were without logical substance. Pound, *Jurisprudence,* Vol. III, p. 461. The professional habit of centuries still lingers to the delight of legal technicians and the obfuscation of the law, and when we attempt to resolve the question of whether an amendment to a pleading is appropriate on the basis of whether the cause of action will be changed, we have merely characterized a given set of facts and made a legal conclusion, rather than making a functional appraisal of why a particular amendment is fair or unfair.

The inestimable value of *stare decisis* should not be confused with the evanescent value of formalism, lest the rational ordering of society be confounded. *Stare decisis*

serves to provide predictability in those areas of life in which men must order their affairs in advance. "Stare Decisis in Courts of Last Resort" 37 HARVARD L. REV. 409 (1924). Formalism, particularly with regard to procedure, is an attempt to create the illusion that the legal structure is a self executing mechanism in which the judge is a machine made from meat, by employing the judicial process of rule selection rather than the rational process of functional analysis.

In the area of commercial law, Adam Smith's notion of the superiority of injustice to uncertainty is highly applicable. No single phenomenon will have as disastrous an effect on commerce as instability. The salutary flow of capital from enterprise to enterprise requires predictability in the legal order far more than equity, since predictability guarantees that under predictable circumstances such capital as is invested will be returned. Where the commercial law is fraught with uncertainty, the sock under the mattress becomes a viable alternative to profitable investment. Cf. J.M. Keynes, *The General Theory of Employment Interest, and Money*, p. 148.

Procedural formalism, however, unlike a healthy regard for precedent in other fields of law has no corresponding practical advantage, as every error of an adverse party is but a windfall to his opponent. The rational prospective litigant, in ordering his affairs must always anticipate that his adversary will retain counsel with the cunning of Blackstone, the wisdom of Holmes, and the eloquence of Darrow.

"Justice" in terms of the result to be achieved in any legal proceeding must always be defined by the ethos of the age, yet "justice" or its adjective form "just" as used in the West Virginia Rules has reference to a functional analysis of procedural questions. "Justice" as a procedural goal of our system, means that there shall be an equality of operation of legal precepts. Pound, *Jurisprudence*, Vol. I, p. 423.

When the word "justice" is used in the new rules, it means that the same set of facts outside of the judicial

process will always give rise to the same result in the judicial process, regardless quite frankly, of the competence of counsel. However, with regard to amendments by one party, this principle must be balanced by the other party's right not to have the judicial process interfere with his claim or liability on the underlying facts, or through misuse of the judicial process put him in a more disadvantageous position than if the legal process had been used correctly in the first instance.

In the case at bar these principles lead to the conclusion that the plaintiff should have been permitted to amend her complaint. The factual allegations state a claim upon which relief can be granted, and if the allegations be true, the beneficiaries are entitled to compensation. Another similarly placed plaintiff under an identical set of facts who secured the appointment of an ancillary administrator in Grant County would be able to recover. The question of appointment is a problem created by the judicial process, and is not part of the underlying factual situation giving rise to the action. On the other side, the defendants have received notice of the grounds for complaint against them, and are not prejudiced by a technical change in the party plaintiff. (However, one could easily imagine a set of facts in which the wrong party defendant were sued, in which case an amendment substituting a party defendant after the expiration of the time in which suit may be brought would substantially prejudice a new defendant, as he would not have timely notice of the grounds for complaint against him, and therefore, would be unable to preserve testimony and physical evidence and prepare his case.)

It is impossible for the judicial process to remain entirely neutral, as the distinction between procedural rules and substantive rights is frequently illusory. However, to the extent possible, under modern concepts of jurisprudence, legal contests should be devoid of those sporting characteristics which gave law the quality of a game of forfeits or trial by ambush.

This case presents a number of complicated issues in a difficult area of the law, and the case was well conducted on both sides by highly competent counsel. However, any expansive discussion of procedural problems created by formalism invites some general comments on the dilemma facing the practicing lawyer. The job of the modern lawyer is far more difficult than it was even forty years ago. With the proliferation of federal law, the complexities of state and federal taxing codes, the multiplicity of administrative agencies, and the rapid rise in substantive decisional law, it is almost impossible for a practicing lawyer to be knowledgeable in every field in which his clients require that he participate.

Judges and particularly appellate judges, are endowed with the sagacity of Monday morning quarterbacks. The practicing lawyer has demands upon him which would severely tax the abilities of history's most versatile Renaissance men. Mistakes by lawyers are not mistakes by clients, and where a lawyer makes a mistake which causes his client to forfeit a case, the rule that identical factual situations outside the judicial process shall yield identical results in the judicial process is severely violated. There are those rare occasions when the dignity of the court or the orderly administration of justice require a meaningful sanction which can only be exacted in the form of forfeiture; however, these instances are rare, particularly where the defect in the proceedings was precipitated by inexperience, the confusing state of the law, or even negligence, rather than by intentional disregard of duty. Many clients are required by financial reasons to retain young, inexperienced, or even marginally qualified counsel, and where there is no prejudice to the adverse party, a court should always endeavor to eliminate disparities in results on the same set of facts attributable exclusively to competence of counsel as long as such action does not prejudice the other side. "Prejudice" in this context does not mean the mere loss of a lawsuit or need to proceed to trial because of the inability to profit from another's mistake, but rather it means a

disadvantage of position which would not have occurred had the lawsuit been prosecuted according to exacting standards of procedural regularity.

For reasons stated in this opinion, we are impelled to answer the first two certified questions in the negative. The third certified question is answered in the affirmative. The rulings of the Circuit Court of Grant County are reversed in part and affirmed in part.

> *Rulings on certified questions are reversed in part and affirmed in part.*

BERRY, CHIEF JUSTICE, concurring:

I concur with the decision in this case as indicated in the first part of the opinion of the Court, but disagree with the propriety of some of the dissertation in the latter part of the opinion regarding procedural formalism, stability of the rule of law and the obligations of counsel to his clients. In the main, such discourse was not necessary for the decision of this certified case and in some instances was not applicable to the questions involved.

I am authorized to state that Justices Caplan, Haden and Sprouse join in this concurrence.